AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| WILLIAM SNYDER AND SHIRLEY SNYDER, | ) ) | Case No. 01-22-0002-8877 |
|       Claimants, | ) ) | |
| vs. | ) ) ) | **RESPONDENT'S UNOPPOSED MOTION FOR LEAVE TO FILE A DISPOSITIVE MOTION** |
| WELLS FARGO BANK, N.A., | ) | |
|       Respondent. | ) ) | |
| | ) | |

Respondent Wells Fargo Bank files this Unopposed Motion for Leave to File a Dispositive Motion under Rule 33 of the Consumer Arbitration Rules requesting leave to file a dispositive motion that, if granted, would dispose of all of the claims asserted by Claimants in the case.  **As noted in the Certificate of Conference below, Claimants state that they are only unopposed to the motion for leave, are opposed to the dispositive motion itself, and reserve all rights and arguments to contest the dispositive motion.**

### Brief Background

Claimants allege that they are victims of a scam that resulted in Claimant William Snyder withdrawing millions of dollars in cash from Claimants' Wells Fargo account and then mailing it to an out-of-state scammer wrapped in bubble wrap, foil, and shipping paper under the false pretense that it would be "put into Claimant William Snyder's stocks and bonds."  Claimants do not allege that Wells Fargo was involved in the scam.  Instead, Plaintiffs primarily contend that Wells Fargo should have reported to the Texas Department of Family and Protective Services that it suspected "financial exploitation" under Section 281.002 of the Texas Finance Code.

Claimants assert causes of action for negligence per se and breach of fiduciary duty. Claimants additionally seek punitive damages under a gross negligence theory and state that Wells Fargo is vicariously liable for its tellers' alleged non-reporting under respondeat superior.

**ARGUMENTS AND AUTHORITIES**

Rule 33 of the Consumer Arbitration Rules authorizes granting leave to file a dispositive motion if "the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case." *See* AM. ARB. ASS'N CONSUMER ARB. R. 33. Here, the attached dispositive motion principally addresses two case-dispositive legal issues. Resolution of the following two legal issues would dispose of all claims without the need and expense of an evidentiary hearing:

**Issue 1: Does Section 281.002 of the Texas Finance Code impose tort liability?**

<u>Summary of Argument</u>: No. A purported violation of a non-penal statute cannot establish a negligence per se claim. Moreover, Section 281.002 does not satisfy the five-factor test laid out by the Texas Supreme Court to determine whether violation of a statute can give rise to tort liability. In *Perry v. S.N.*, the Texas Supreme Court determined that non-compliance with a penal statute mandating the reporting of child abuse by any person with "cause to believe" that such abuse has occurred cannot be utilized to impose tort-based liability as a matter of law. *See* 973 S.W.2d 301, 309 (Tex. 1998). Section 281.002 contains the same "cause to believe" standard as the reporting statute in *Perry*. Application of the five-factor test produces the same conclusion reached in *Perry*. If non-compliance with a penal child abuse reporting statute does not impose tort liability, neither does alleged non-compliance with a non-penal reporting statute related to third-party financial exploitation of vulnerable adults. Because there is no tort liability under Section 281.002, the Claimants' gross negligence claim and vicarious liability theory also must fail.

2

**Issue 2:  Does Wells Fargo owe the Snyders fiduciary duties?**

<u>Summary of Argument</u>:  No.  Because Section 281.002 cannot impose tort liability under a negligence per se theory, it also cannot be used to impose fiduciary duties in a non-existent fiduciary relationship between a bank and a customer as a matter of Texas law.[1]

**PRAYER**

For these reasons and for those set forth in the attached Rule 33 Dispositive Motion, there is substantial cause that the motion is likely to succeed and dispose of all the issues in the case. Therefore, Wells Fargo requests that leave be granted to file a dispositive motion.

Respectfully submitted,

**LOCKE LORD LLP**

By:_____

**Robert T. Mowrey**
State Bar No. 14607500
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000
(214) 740-8800 (Facsimile)
rmowrey@lockelord.com
aanthony@lockelord.com

**B. David L. Foster**
State Bar No. 24031555
**Daniel Durell**
State Bar No. 24078450
600 Congress Ave., Suite 2200
Austin, Texas 78701
(512) 305-4700
(512) 305-4800 (Facsimile)
dfoster@lockelord.com
daniel.durell@lockelord.com

**ATTORNEYS FOR RESPONDENT
WELLS FARGO BANK, N.A.**

---

[1] As stated in the proposed Rule 33 Dispositive Motion, while a failure to report does not provide a private right of action or grounds for tort liability, it can lead to governmental investigation or enforcement actions.

3

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Claimants' counsel by email on February 24, 2023, as to whether Claimants were opposed to the leave requested in this Motion so long as it is made clear that Claimants were only unopposed to the motion for leave, remain opposed to the dispositive motion itself, and reserve all rights and arguments to contest the dispositive motion.

/s/ Dave Foster
B. David L. Foster

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on this the 1st day of March, 2023, as indicated below to the following and to each counsel of record:

**VIA EMAIL**
Ernest W. "Butch" Boyd
Michael J. Blanchard
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77098
butchboyd@butchboydlawfirm.com
mikeblanchard@butchboydlawfirm.com
*Attorneys for Claimants*

**VIA EMAIL**
Michael R. Gallagher
The Gallagher Law Firm PLLC
2905 Sackett Street
Houston, Texas 77098
mike@gld-law.com
*Attorneys for Claimants*

Daniel Durell

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| WILLIAM SNYDER AND SHIRLEY SNYDER, | ) ) ) Case No. 01-22-0002-8877 |
|      *Claimants*, | ) |
| | ) **RESPONDENT'S RULE 33** |
| vs. | ) **DISPOSITIVE MOTION** |
| | ) |
| WELLS FARGO BANK, N.A., | ) |
|      *Respondent*. | ) |
| | ) |

Respondent Wells Fargo Bank, N.A. files this Dispositive Motion under Rule 33 of the Consumer Arbitration Rules requesting a take-nothing award in Wells Fargo's favor as to all claims alleged by Claimants William and Shirley Snyder against it.

## INTRODUCTION

Abuse and exploitation of vulnerable persons—including children, the disabled, and the elderly—is a heinous crime.  To help protect victims, the Legislature passed several laws requiring persons with "cause to believe" abuse or exploitation has occurred to report it to the appropriate agency.[1]  The failure to report is a criminal offense in some cases.[2]  In other cases, the failure to report could lead to governmental investigation or enforcement actions.  However, the Legislature has never authorized a private right of action to pursue violations of the reporting mandates.

Without a statutory cause of action, victims have urged courts to recognize a violation of reporting mandates as a basis for tort liability.  Texas courts have uniformly refused to do so.  The Texas Supreme Court's decision in *Perry v. S.N.* is the exemplar.[3]

---

[1] *See, e.g.*, TEX. FAM. CODE § 261.101–.105 (child abuse); TEX. HUM. RES. CODE § 48.051 (elder abuse, neglect, or exploitation); TEX. FIN. CODE § 281.002 (requiring financial institutions to report elder financial exploitation).
[2] *See, e.g.*, TEX. FAM. CODE § 261.109 (child abuse); TEX. HUM. RES. CODE § 48.052 (elder abuse, neglect, or exploitation).
[3] *See* 973 S.W.2d 301, 309 (Tex. 1998).  The Texas Supreme Court's decision in *Perry* is attached as **Exhibit A**.

The facts in *Perry* were as bad as they get—the alleged failure by eyewitnesses to report the sexual molestation of preschool children in the custody of a daycare center.[4]  The statute at issue required any person with "cause to believe" that a child's welfare may be adversely affected by abuse to immediately report it to the appropriate state agency and made the knowing failure to do so a misdemeanor.[5]  Yet, the Court held that the reporting mandate could <u>not</u> be used to "establish[] a duty and standard of conduct in tort."[6]  There was no dissent.

The Court's analysis is legally sound.  The Court reasoned that it could not consider the issue in the vacuum of the deplorable facts before it.[7]  Instead, the Court emphasized that it "must look beyond the facts of this particular case to consider the full reach of the statute."[8]  Utilizing a five-factor analysis, the Court determined that the reporting statute's reach and impact would be unacceptable if applied as a tort-based duty because it would impose "immense potential liability" under an "ill-defined standard" on a class of individuals "whose relationship to the abuse was extremely indirect."[9]

Like in *Perry*, the Snyders allege only tort-based claims premised on Wells Fargo's alleged failure to report elder "financial exploitation" under a similar reporting statute containing the same "cause to believe" standard.  As shown below, the five-factor analysis weighs even more heavily against imposing tort liability than in *Perry*.

Even in the absence of *Perry*, the Snyders' allegations are insufficient to show that Wells Fargo had "cause to believe" that "exploitation" was occurring.  Simply stated, "exploitation"

---

[4] *See id*. at 305.
[5] *Id*. at 302 (citing Tex. Fam. Code §§ 261.101, .109).
[6] *Id.* at 309.
[7] *See id.* at 305.
[8] *Id.*; *see also id.* at 306 (noting that recognizing "a new, purely statutory duty" would have an extreme effect on the common law of negligence "when it allows a cause of action where the common law would not").
[9] *Id.* at 309.

under the statute means a *third party's* undue influence or compulsion that *causes* a vulnerable adult to engage in unusual conduct.[10]  The Snyders allege only that Mr. Snyder's unusual banking conduct triggered the "cause to believe" standard.  There is no dispute that Mr. Snyder's cash withdrawals were unusual; however, unusual conduct is not enough.  Otherwise, the Legislature would have simply required banks to report vulnerable adults' unusual banking transactions.  But that is not the statute it passed.

FACTUAL BACKGROUND[11]

The scam began when Mr. Snyder clicked a "popup notice" that indicated his computer was vulnerable to viruses.[12]  **Ex. B** at 1–2.  The click apparently resulted in an email to Mr. Snyder requesting Mr. Snyder contact Microsoft.  **Ex. B** at 2.  Unfortunately, Mr. Snyder made the call. **Ex. B** at 2.  Posing as a Microsoft employee, the fraudster convinced Mr. Snyder that his computer had been hacked and that "all their financial assets would be drained unless their money was removed from their accounts and sent to Microsoft for safe keeping and investment."[13]  **Ex. C** (Rog. 3).  Regrettably, Mr. Snyder complied.

During the next six months, Mr. Snyder withdrew millions in cash from the Snyders' Wells Fargo checking account through dozens of transactions at branches in Midland, Texas.  **Ex. B** at 2–4.  Following the fraudster's instructions, Mr. Snyder mailed the cash to multiple out-of-state addresses wrapped in foil, bubble wrap, and shipping paper.  **Ex. B** at 2.  Mr. Snyder apparently thought that the fraudster was putting the cash into his "stocks and bonds."  **Ex. B** at 3.

---

[10] "Exploitation" is defined as "the act of forcing, compelling, or exerting undue influence over a person causing the person to act in a way that is inconsistent with the person's relevant past behavior."  TEX. FIN. CODE § 281.001(5).
[11] Like the Court in *Perry*, Wells Fargo takes the allegations in the Snyders' pleading as true merely for the purposes of this Motion.  *See id.* at 303.  Wells Fargo reserves the right to challenge the allegations at the appropriate time.
[12] For ease of reference, Wells Fargo attaches the Snyders' Statement of Claim filed in this proceeding as **Exhibit B**.
[13] Wells Fargo attaches as **Exhibit C** selected responses from the Snyders' Objections and Responses to Interrogatories served by Wells Fargo in this proceeding.

3

The Snyders allege that the scam "could not have succeeded without Respondent's violation of statutes protecting vulnerable adults." **Ex. B** at 3.  The Snyders assert four purported causes of action: negligence per se; breach of fiduciary duty; vicarious liability; and gross negligence.  **Ex. B** at 4–6.  The Snyders' claims rely entirely on Wells Fargo allegedly violating statutory duties under Chapter 281 of the Texas Finance Code.

First, the Snyders allege Wells Fargo is negligent per se because it violated duties to report suspected financial exploitation to the Department and adopt related policies and procedures under Section 281.002.[14]  **Ex. B** at 4–5.  The Snyders state that Wells Fargo's "wrongful actions were grossly negligent" and that they seek exemplary damages.  **Ex. B** at 6.

Second, the Snyders' fiduciary duty claim is premised on Wells Fargo allegedly "breach[ing] their duties by not reporting suspicious activity, by not having procedures in place to detect financial exploitation of vulnerable results, and by not placing holds on the account once suspicious activity appeared."  **Ex. B** at 6.

Third, the Snyders allege "Wells Fargo is vicariously liable for the acts of its tellers under the doctrine of respondeat superior" based on the tellers' alleged failure to notify Wells Fargo of suspected financial exploitation under Section 281.002.  **Ex. B** at 4–6.

### ARGUMENTS AND AUTHORITIES

The Snyders' claims are premised entirely on Wells Fargo's alleged violations of Chapter 281 of the Texas Finance Code (the "Act").  The Act principally requires a bank to report to the Texas Department of Family and Protective Services if it has "cause to believe" that "financial

---

[14] The Snyders additionally refer to a duty to "plac[e] holds on the account once suspicious activity appeared."  **Ex. B** at 6.  Section 281.004 permits banks to place a temporary hold on transactions if *financial exploitation* is suspected and requires banks to do so if requested by law enforcement or the Department.  *See* TEX. FIN. CODE § 281.004.

exploitation of a vulnerable adult" has occurred, is occurring, or has been attempted.[15]  Chapter 35 authorizes the Texas Department of Banking to either administratively enforce the Act's requirements or refer non-compliance to the Attorney General for enforcement.[16]  However, there is no private right of action for alleged violations of the Act.[17]

Likely cognizant of this legislatively omitted remedy, the Snyders allege claims based exclusively in tort.  Tort claims require the existence of tort-based duties.  "Whether a duty exists is a threshold inquiry and a question of law; liability cannot be imposed if no duty exists."[18]  No such duties exist as a matter of Texas law.

**A.    The Snyders cannot maintain a claim for negligence per se based on alleged violations of the Act.**

The Snyders cannot utilize alleged non-compliance with the Act to impose tort liability on Wells Fargo for two independent reasons.  First, Section 281.002 cannot serve as the basis for a negligence per se claim because it is not a penal statute.  Second, the five *Perry* factors otherwise foreclose the negligence per se claim as a matter of law even if the Legislature would have included a penal provision.

1.    The Act is a non-penal statute.

"Negligence per se is the doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care."[19]  "A violation of a non-penal administrative code statute does not establish a negligence per-se claim."[20]  A "penal statute is one that defines a

---

[15] TEX. FIN. CODE § 281.001 (definitions), .002(a)–(c) (assessment and reporting requirement);  *see also id.* §§ 281.002(d) (internal policies and procedures requirement), .003 (permissive third-party notification), .004 (authority for temporary transaction holds).
[16] *Id.* § 35.009.
[17] *See id.* §§ 281.001–.006.
[18] *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993) ("[T]he existence of a legally cognizable duty is a prerequisite to all tort liability.").
[19] *Reeder v. Daniel*, 61 S.W.3d 359, 361–62 (Tex. 2001).
[20] *Ridgecrest Ret. & Healthcare v. Urban*, 135 S.W.3d 757, 762 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding that the trial court erred in submitting a negligence per se instruction relying on non-penal administrative

criminal offense and specifies a corresponding fine, penalty or punishment."[21]  The Act is not a penal statute.  Thus, Section 281.002 cannot support a negligence per se theory as a matter of law.[22]

> 2. <u>Section 281.002 cannot support a negligence per se claim under the *Perry* factors</u>.

Like the child abuse reporting statute, the Act contains the same "cause to believe" standard, seeks to protect vulnerable individuals, and requires reporting to a governmental agency:

| TEX. FIN. CODE § 281.002 | TEX. FAM. CODE § 261.109(a) (1998) |
|---|---|
| If a financial institution . . . has ***cause to believe*** that financial exploitation of a vulnerable adult who is an account holder with the financial institution has occurred, is occurring, or has been attempted, the financial institution shall assess the suspected financial exploitation and submit a report to the department . . . | A person commits [a Class B misdemeanor] offense if the person has ***cause to believe*** that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report as provided in this chapter. |

Like in *Perry*, there is no dispute that the Snyders are within the class of persons that the reporting requirement in Section 281.002 was meant to protect and that their alleged injury is the kind of injury the statute seeks to prevent.[23]  "But this does not end [the] inquiry."[24]  The five-factor analysis produces the same conclusion the Texas Supreme Court reached in *Perry*—the reporting statute does not impose tort-based liability even if the Act did contain penal provisions.

| **Factor 1**: | **Is there a preexisting common law tort duty owed to the Snyders?** |
|---|---|
| <u>Answer</u>: | No.  "At common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress."  *Perry*, 973 S.W.2d at 306. |

---

provisions setting forth requirements for an assisted-living facility); *see also Pack v. Crossroads, Inc.*, 53 S.W.3d 492 (Tex. App.—Fort Worth 2001, pet. denied) (holding that licensing requirement for nursing facility were not penal in nature and this could not support a negligence per se claim).

[21] *Pack*, 53 S.W.3d 509–10 (holding that several civil remedies for non-compliance, including monetary penalties, did not make statute penal).

[22] *See Coyoy v. CoreCivic, Inc.*, No. SA-19-CA-00916-FB, 2022 WL 18034487, at *9 n.3 (W.D. Tex. Oct. 11, 2022) (identifying several Texas federal court decisions that have dismissed negligence per se claims based on the alleged violation of non-penal administrative rules).

[23] *See Perry*, 973 S.W.2d at 305.

[24] *See id.*

This initial inquiry is important because negligence per se presumes that a common law duty already exists; thus, "the statute's role is merely to define more precisely what conduct breaches that duty."[25]  Consequently, the absence of a common law duty weighs heavily against utilizing a penal statute to create and define a *new* type of tort liability—especially "when, as here, the statute criminalizes inaction rather than action."[26]  The Court's application of this initial factor in *Perry* is directly on point.

The Court in *Perry* confirmed that there is no common law duty to report child abuse.[27] Instead, the general rule applicable in *Perry* provides that there is "no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress."[28]  The same general no-liability rule applies here.  Wells Fargo has no common law duty to protect the Snyders from the fraudster's criminal acts—much less assess and report *suspected* financial exploitation.  In the absence of these duties, Wells Fargo also does not have a common law duty to adopt policies and procedures related to reporting and assessing suspected financial exploitation.

| **Factor 2**: | **Does the statute clearly define the conduct required or prohibited?** |
|---|---|
| <u>Answer</u>: | No.  The reporting statute contains the same ill-defined "cause to believe" standard for the required reporting of suspected financial exploitation. |

As compared above, the relevant language in the statute in *Perry* and the Act is identical. The Court in *Perry* determined that a "cause to believe" standard impermissibly conditions the requirement to report on "difficult judgment calls" and "does not clearly define what conduct is

---

[25] *Id.* at 306. As noted by the Court, the most common application of negligence per se relates to the violation of traffic statutes by drivers and train operators—"actors who already owed a common law duty to exercise reasonable care toward others on the road or track."  *Id.*
[26] *See id.*
[27] *Id.*
[28] *Id.*

required in many conceivable situations."[29]  Section 281.002 similarly requires difficult judgment

calls.  For instance:

- What if the account holder, when asked, refuses to provide information about the purpose of the transactions?

- What if the account holder provides a plausible explanation for the initial non-routine transaction that justify the subsequent non-routine transactions?

- Is one non-routine transaction "cause to believe" there has been financial exploitation? Two non-routine transactions?  Three?

- If more than one is required, is there a span of time the transactions need to occur in order for there to be "cause to believe" financial exploitation occurred?

- What is a non-routine transaction?  Is there a monetary threshold that makes a transaction non-routine?

- Does a string of non-routine transactions become routine?

Once again, the *Perry* analysis demonstrates that this factor weighs against tort liability.[30]

| | |
|---|---|
| **Factor 3:** | **Could the statute impose liability without fault?** |
| <u>Answer</u>: | Yes.  Unlike the statute at issue in *Perry*, the statute at issue in this case does not contain a scienter element because it is not a penal statute. |

In *Perry*, the Court agreed with the lower court's conclusion that the child abuse reporting

statute did not impose this risk because it had a scienter element—a "knowing" failure to report.[31]

This is where the reporting statutes materially differ.

Here, the Act does not contain the Family Code's scienter element because it is not a penal

statute.  As a result, Section 281.002 could create liability without fault if applied to impose tort-

based liability.  A financial institution's failure to report financial exploitation may often be based

on employees' innocent non-recognition of financial exploitation when processing a transaction

---

[29] *Id.*
[30] *Id.* at 309.
[31] *Id.*

given the ambiguity in the "cause to believe" language. Therefore, unlike in *Perry*, the third factor also weighs against imposing tort-based liability for a Section 281.002 nonreporting violation.

| Factor 4: | Would damages be disproportionate to the seriousness of the statutory violation? |
|---|---|
| <u>Answer</u>: | Yes. "The Legislature has expressed a judgment that [financial exploitation] and nonreporting deserve very different legal consequences." *See Perry*, 973 S.W.2d at 308. The financial exploitation in this case is a first degree felony punishable by a life sentence. The reporting statute at issue here is non-penal and does not contain a private right of action. |

In *Perry*, there was no question that child abusers can inflict "enormous damages" on their victims.[32] This factor turned on allocating those damages between the abuser and the person that failed to report the abuse. The Court relied on Legislature's policy decisions to analyze this factor.[33]

Child abuse can be a first degree felony punishable with a prison sentence of up to 99 years.[34] In contrast, the Legislature determined that the failure to report child abuse was only a Class B misdemeanor (now a Class A misdemeanor) punishable by no more than 6 months in jail and/or a fine not to exceed $2,000 (now punishable by up to a year in jail and/or a fine not to exceed $4,000) "no matter how serious the underlying crime."[35] The Court concluded:

> This evidence of legislative intent to penalize nonreporters far less severely than abusers weighs against holding a person who fails to report suspected abuse civilly liable for the enormous damages that the abuser subsequently inflicts.[36]

Applying this factor to Section 281.002 requires the same conclusion.

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* In 2009, the Legislature amended Section 261.109 to reflect that nonreporting is now a Class A misdemeanor. *See* TEX. FAM. CODE § 261.109.
[36] *Perry*, 973 S.W.2d at 309.

9

This case demonstrates that fraudsters can do serious financial damage to their victims. The maximum punishment for the fraudster's financial exploitation of the Snyders is a life sentence with a restitution order requiring the fraudster to make the Snyders whole.[37]  On the other hand, the Legislature chose to omit penal provisions and a private right of action from the Act.[38]  Therefore, the fourth factor weighs even more heavily against imposing tort-based liability than it did in *Perry*.

| Factor 5: | Is the plaintiff's injury a direct or indirect result of the statutory violation? |
|---|---|
| Answer: | Indirect.  The relationship between the violation and injury is "extremely indirect" because the statute "places a fourth party between the defendant and the plaintiff: the person or agency whom the defendant is required to make the report."  *See Perry*, 973 S.W.2d at 309 (emphasis in original). |

The Court in *Perry* determined that the causal relationship between the failure to report child abuse to a state agency and the plaintiff's injury was "extremely indirect."[39]  The Court's reasoning was simple.  The person required to report the abuse has no control over two actors: the criminal actually causing the injury and the state agency tasked with stopping the injury.[40]  The Court noted that the causal link was "significantly more attenuated" than the other two instances the Court imposed civil liability on a person for facilitating the tort of a third party through violating of a statute.[41]

---

[37] TEX. PENAL CODE §§ 12.32 (providing that first-degree felonies are punishable by imprisonment for life or for a term between five and ninety-nine years), 32.55 (outlining the maximum offense of financial abuse of an elderly individual as a first degree felony), 42.037 (authorizing restitution).
[38] The closest comparison is to Section 48.052 of the Human Resources Code, which also makes the nonreporting of elder abuse a Class A misdemeanor.  *See* TEX. HUM. RES. CODE § 48.052.
[39] *Perry*, 973 S.W.2d at 309.
[40] *See id.*
[41] *Id.*

The application of the fifth *Perry* factor to Section 281.002 compels the same conclusion. Section 281.002 similarly interposes two independent actors between a bank and the vulnerable person: the fraudster and the Department.  Nothing in the Act *requires* a bank to do anything but assess and report the suspected financial exploitation.  Like in *Perry*, the fifth factor weighs heavily against utilizing a violation of section 281.002 to impose tort-based liability.

**To sum up . . .**

Section 281.002 cannot support a negligence per se claim because it is not a penal statute. Nevertheless, all five of the *Perry* factors demonstrate that Section 281.002 cannot be used to impose tort-based liability.  The Legislature clearly did not intend such a result.

**B.      There cannot be gross negligence in the absence of ordinary negligence.**

The Snyders enumerate gross negligence separately to seek exemplary damages.  *See* **Ex. B** at 6.  However, gross negligence is not an independent cause of action.  Therefore, the Snyders' gross negligence claim fails in the absence of a negligence per se claim.[42]

**C.      The Snyders cannot maintain a claim for breach of fiduciary duty as a matter of law.**

The Snyders' breach of fiduciary duty claim simply recasts their negligence per se claim. The Snyders allege that Wells Fargo breached "fiduciary duties" by "not reporting suspicious activity, by not having procedures in place to detect financial exploitation of vulnerable results, and by not placing holds on the account once suspicious activity appeared."  **Ex. B** at 6.  As a matter of law, Wells Fargo does not owe the Snyder any fiduciary duties.  Their claim also fails for the same reasons as their negligence per se claim because the alleged "fiduciary duties" appear to be derived from the Act.

---

[42] *See Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[I]t is well established that a finding of ordinary negligence is prerequisite to a finding of gross negligence.").

1.   <u>There is no fiduciary relationship between the Snyders and Wells Fargo</u>.

There cannot be a breach of a fiduciary duty absent a fiduciary relationship. "Whether a fiduciary duty exists is a question of law."[43]  Texas law recognizes both formal and informal fiduciary relationships.[44]  Neither exists in this case.  It is well established that there is no *formal* fiduciary relationship between a bank and its customers under Texas law.[45]  Because there are no allegations—much less any evidence—that could support the creation of an *informal* fiduciary relationship, the Snyders' claim fails as a matter of Texas law.

<u>First</u>, courts have only been willing to consider the existence of an informal fiduciary relationship between a bank and its customer in *business* transactions when the bank has significant control or influence over the customer's business that implicates a "special relationship" outside of the normal banking relationship.[46]  It is undisputed that the transactions at issue were *personal* transactions premised on Mr. Snyder withdrawing cash based on false premises supplied by the fraudster.  **Ex. B** at 2–3.

<u>Second</u>, an informal fiduciary relationship is an "extraordinary one and will not be created lightly."[47]  Such a duty may arise from "a moral, social, domestic or purely personal relationship of trust and confidence."[48]  The Texas Supreme Court has "imprecisely" described these types of relationships as those "in which influence has been acquired and abused, [and] in which confidence has been reposed and betrayed."[49]  No such relationship exists here.  There is nothing extraordinary

---

[43] *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 728 (Tex. App.—Dallas 2015, no pet.).

[44] *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997).

[45] *See, e.g.*, *Davis v. West*, 317 S.W.3d 301, 312 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("The relationship between a bank and its customers does not usually create a special or fiduciary relationship."); *see also Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 880 (Tex. App.—El Paso 2021, pet. denied) ("Numerous courts, including this one, have concluded that in an ordinary banking relationship in which a customer has done no more than deposit funds with a financial institution, neither a fiduciary or confidential relationship has been created.").

[46] *Davis*, 317 S.W.3d at 312.

[47] *Clark*, 460 S.W.3d at 728.

[48] *Matter of Estate of Poe*, 648 S.W.3d 277, 287 (Tex. 2022).

[49] *See id.*

about the relationship within the banking context.  There are no allegations that Wells Fargo has abused any influence it has over the Snyders or utilized the Snyders' confidential information to its benefit or to the Snyders' detriment.

Third, the Snyders' allegations of a long-standing business relationship with Wells Fargo and vague contention that they "were encouraged to trust and follow [Wells Fargo's] financial advice" is insufficient—even if taken as true—to establish an informal fiduciary relationship.  *See* **Ex. B** at 3.  "Proving the necessary confidential relationship requires more, however, than evidence of prior dealings between the parties, and the subjective trust one party places in another does not establish a confidential relationship."[50]  Multiple Texas courts have rejected similar arguments when affirming summary judgments in favor of financial institutions on fiduciary duty claims.[51] In any event, the Snyders do not allege that their damages were the result of "trust[ing] and follow[ing Wells Fargo's] financial advice."  *See* **Ex. B** at 3.

Fourth, the Snyders cannot utilize the Act as a basis for creating a fiduciary relationship. The five-factor *Perry* analysis forecloses any such argument.[52]  The alleged "fiduciary duties" are derived entirely from the Act.  *See* **Ex. B** at 6.  There are no corresponding common law fiduciary duties imposed on banks.[53]  Moreover, the Legislature knows how to create fiduciary

---

[50] *Consol. Bearing & Supply Co., Inc. v. First Nat. Bank at Lubbock*, 720 S.W.2d 647, 648–49 (Tex. App.—Amarillo 1986, no writ) (holding that there was no fiduciary relationship despite bank customer's testimony that there was a "trust relationship" that required sharing of confidential information and a forty-year banking relationship.

[51] *See, e.g.*, *Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393, 410 (Tex. App.—El Paso 2004, no pet.) ("To show a special relationship, Appellants point to evidence that they were bank customers, had substantial deposits in the bank, were shareholders in the bank, and they had often sought the bank's advice on various matters. These facts do not demonstrate that MAB had excessive control over or influence in Appellants' business activities."); *Winston v. Lake Jackson Bank*, 574 S.W.2d 628, 629 (Tex. Civ. App.—Houston [14th Dist.] 1978, no writ) (holding that "extensive prior dealings" and contention that the bank was a "financial advisor" to the customer was not enough to establish an informal fiduciary duty).

[52] *Cf. Doe v. Henderson Indep. Sch. Dist.*, 237 F.3d 631 (5th Cir. 2000) ("Because the child abuse reporting statute does not provide a standard of civil liability for negligence per se, it does not provide a standard for fraud.").

[53] Again, there is no common-law fiduciary duty to protect another from a third-party's criminal act.  None of the traditional fiduciary duties are applicable: (1) the duty of loyalty and utmost good faith; (2) duty of candor; (3) duty

relationships.[54]  It did not do so with respect to the Act.  Consequently, the Legislature did not

intend the Act to impose fiduciary duties in the absence of clear language establishing a fiduciary

relationship, especially where no fiduciary relationship exists at common law.

**D.      The Snyders vicarious liability theory fails as a matter of law.**

The Snyders allege that "Wells Fargo is vicariously liable for the acts of its tellers under

the doctrine of respondeat superior."  **Ex. B** at 6.  Simply, the Snyders seek to hold Wells Fargo

liable for its tellers' alleged failure to comply with Section 281.002's notification requirement.

**Ex. B** at 4–5.  Under this theory, the Snyders must first show that the tellers are civilly liable to

them in tort before the tellers' liability could potentially be imputed to Wells Fargo.[55]  However,

as argued above, a violation of Section 281.002 cannot establish tort-based liability as a matter of

law.  Because the tellers have no liability to the Snyders, Wells Fargo has no liability to the Snyders

under a vicarious liability theory as a matter of law.

**E.      The Snyders have failed to sufficiently allege that Wells Fargo had "cause to believe" that there was "exploitation"—as that term is defined in the Act.**

Even if *Perry* did not foreclose the Snyders' claims (it does), the Snyders' allegations are

insufficient to show that Wells Fargo had "cause to believe" that Mr. Snyder withdrawals were the

result of "exploitation."

The Act defines "exploitation" as "the act of forcing, compelling, or exerting undue

influence over a person causing the person to act in a way that is inconsistent with the person's

---

to refrain from self-dealing; (4) duty to act with integrity; (5) duty of fair, honest dealing; and (6) the duty of full disclosure.  *See Wolf v. Ramirez*, 622 S.W.3d 126, 142 (Tex. App.—El Paso 2020, no pet.).

[54] *See, e.g.*, TEX. PROP. CODE § 82.103 ("Each officer or member of the [condominium association] board is liable as a fiduciary of the unit owners for the officer's or member's acts or omissions."); TEX. EDUC. CODE § 12.1222 ("[T]he attorney general may bring suit against a member of the governing body of an open-enrollment charter school for breach of a fiduciary duty by the member . . . ."); TEX. ESTATES CODE § 751.101 (providing that an agent under a durable power of attorney "is a 'fiduciary' as to the principal").

[55] *See DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 654 (Tex. 1995) (holding employer is not vicariously liable for acts of its employee when employee's affirmative defense negates employee's liability).

relevant past behavior."[56]  In other words, exploitation exists only if there is inconsistent behavior *caused* by a third party's force, compulsion, or undue influence.  Inconsistent behavior standing alone is insufficient.  Yet, that is all the Snyders allege in this case.  *See* **Ex. B** at 4 ("'Cause to believe' arose from the execution of sixty cash transactions totaling millions of dollars unlike any other transactions Claimants had posted to their accounts over a decades-long relationship.").

Inconsistent or suspicious banking behavior might trigger different reporting requirements under federal law.  For instance, the Bank Secrecy Act and its regulatory authorities require banks to report certain unusual or inconsistent transactions, including cash withdrawals, to the appropriate federal law enforcement and governmental agencies.[57]  There is no "exploitation" requirement.  However, these types of reports—known as a suspicious activity report ("SAR")—are highly confidential tools utilized by law enforcement to identify, stop, and apprehend criminals.[58]  Banks are strictly prohibited from disclosing to anyone that it filed a SAR, that it did not file a SAR, and any information that would reveal the existence or non-existence of a SAR.[59]  Like the Act, there is no private right of action under the Bank Secrecy Act.[60]

There is no dispute that Mr. Snyder's cash withdrawals were unusual.  But the Snyders do not allege there was "cause to believe" that the cash withdrawals were *caused* by a third-party fraudster's undue influence.  There are no allegations that Wells Fargo was aware of the alleged fraudster, that anyone accompanied Mr. Snyder to make the withdrawals, that Mr. Snyder was

---

[56] *Id.* § 281.001(2).

[57] 31 U.S.C. § 5318(g); 12 C.F.R. § 21.11(c).

[58] *See* 31 U.S.C. § 5311(5).

[59] *Id.* § 21.11(k); *see also Whitney Nat. Bank v. Karam*, 306 F. Supp. 2d 678, 682 (S.D. Tex. 2004) (noting that this prohibition "creates an unqualified discovery and evidentiary privilege that courts have held cannot be waived"). Violation of the non-disclosure provision is severe and includes both civil and criminal liability.  *See* 31 U.S.C. §§ 5321, 5322.

[60] *See, e.g., AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004) ("[T]he Bank Secrecy Act does not create a private right of action."); *Armstrong v. Am. Pallet Leasing, Inc.*, 678 F. Supp. 2d 827, 875 (N.D. Iowa 2009) ("Because the Bank Secrecy Act does not permit a private right of action, it follows that it cannot be construed as giving rise to a duty of care flowing to plaintiffs in this case.").

taking directions from someone else over the phone, or that any third party was in any way associated with Mr. Snyder's decision to instruct Wells Fargo to withdraw his own money from his own account. The cash withdrawals do not implicate undue influence any more than they show that Mr. Snyder may have desired to hold large amounts of his cash or convert the cash into gold or some other commodity, had developed distrust in financial institutions or the stock market after the COVID-19 downturn, or was concerned about the FDIC's standard $250,000 insurance limitation. Therefore, all of the Snyders' claims must fail.

CONCLUSION

The Snyders' situation is undoubtedly a tragedy that involves a loss of millions of dollars to a fraudster. What the fraudster did to the Snyders is criminal. The prosecutorial authorities are well-suited to pursue a potential life sentence for the fraudster and a restitution order requiring the fraudster to make the Snyders whole. The Legislature authorized such a punishment and recovery.

Nevertheless, there is no doubt that financial exploitation of the elderly remains a perverse reality. While the Legislature has given banks reporting mandates and tools that could potentially mitigate financial exploitation, it stopped well short of imposing private civil liability on banks for a fraudster's criminal acts. The Texas Supreme Court in *Perry* exhaustively articulated why a reporting mandate cannot be used to impose tort liability in this case. Consequently, requests to impose civil liability on a bank for alleged non-compliance with the reporting mandates must be addressed to the Legislature. Enforcement of the reporting mandate remains exclusively vested in the Texas Department of Banking and, on referral, the Attorney General's office.

For all the reasons articulated above, Wells Fargo requests a take-nothing award in its favor as to all claims alleged by Claimants William and Shirley Snyder against it.

Respectfully submitted,

**LOCKE LORD LLP**

By:_____

      **Robert T. Mowrey**
      State Bar No. 14607500
      2200 Ross Avenue, Suite 2800
      Dallas, Texas 75201
      (214) 740-8000
      (214) 740-8800 (Facsimile)
      rmowrey@lockelord.com
      aanthony@lockelord.com

      **B. David L. Foster**
      State Bar No. 24031555
      **Daniel Durell**
      State Bar No. 24078450
      600 Congress Ave., Suite 2200
      Austin, Texas 78701
      (512) 305-4700
      (512) 305-4800 (Facsimile)
      dfoster@lockelord.com
      daniel.durell@lockelord.com

      **ATTORNEYS FOR RESPONDENT**
      **WELLS FARGO BANK, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on this the 1st day of March, 2023, as indicated below to the following and to each counsel of record registered with the e-filing system:

**VIA EMAIL**
Ernest W. "Butch" Boyd
Michael J. Blanchard
Butch Boyd Law Firm
2905 Sackett Street
Houston, Texas 77098
butchboyd@butchboydlawfirm.com
mikeblanchard@butchboydlawfirm.com
*Attorneys for Claimants*

**VIA EMAIL**
Michael R. Gallagher
The Gallagher Law Firm PLLC
2905 Sackett Street
Houston, Texas 77098
mike@gld-law.com
*Attorneys for Claimants*

Daniel Durell

# EXHIBIT A

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Vanhook v. Somerset Health Facilities, LP,
E.D.Ky.,   December 15, 2014

973 S.W.2d 301
Supreme Court of Texas.

Douglas Wayne PERRY, Janise

White, and Raul Quintero, Petitioners,

v.

S.N. and S.N., individually and a/n/f of B.N., a

minor, and a/n/f of K.N., a minor, Respondents.

No. 97–0573.
|
Argued Jan. 7, 1998.
|
Decided July 3, 1998.

**Synopsis**

Parents, individually and as next friends of their children, brought negligence action against friends of day care providers for failing to report child abuse they allegedly witnessed at day-care center. The 53rd Judicial District Court, Travis County, Paul R. Davis, Jr., J., granted friends' motion for summary judgment, and parents appealed. The Austin Court of Appeals, 944 S.W.2d 728, reversed and remanded, and friends petitioned for writ of error. The Supreme Court, Phillips, C.J., held that violation of child abuse reporting statute was not negligence per se.

Reversed and rendered.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*302**  Gary E. Zausmer, Jeffrey Jury, Tom Tourtellotte, Austin, for Petitioners.

Greg Reed, Lionel J. Roach, Austin, for Respondents.

**Opinion**

PHILLIPS, Chief Justice, delivered the opinion of the Court.

Respondents' motion for rehearing is overruled. Our opinion of May 8, 1998, is withdrawn and the following is substituted in its place.

This is a suit for injuries arising out of the abuse of children at a day care center. Plaintiffs filed suit individually and as next friends of their two children, alleging that defendants witnessed the abuse and failed to report it to the police or child welfare officials. The sole issue before us is whether plaintiffs may maintain a cause of action for negligence per se based on the Family Code, which requires any person having cause to believe a child is being abused to report the abuse to state authorities and makes the knowing failure to do so a misdemeanor. *See* TEX. FAM.CODE §§ 261.101(a), 261.109 (formerly TEX. FAM.CODE §§ 34.01, 34.07). The trial court granted summary judgment for defendants, but the court of appeals reversed and remanded plaintiffs' negligence per se and gross negligence claims for trial. Nash v. Perry, 944 S.W.2d 728 (Tex.App.—Austin 1997). We reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing. Because plaintiffs did not preserve their common law negligence claims, we do not decide whether there should be a common law duty to report child abuse in some circumstances.

B.N. and K.N. attended a day care center operated by Francis Keller and her husband Daniel Keller from March 25, 1991, to August 28, 1991. Their parents, S.N. and S.N., allege that during that period, Daniel Keller regularly abused B.N. and K.N. and other children at the center both physically and sexually. Mr. and Mrs. N. brought suit against the Kellers and three of the Kellers' friends, Douglas Perry, Janise White, and Raul Quintero. Plaintiffs claim that Francis Keller confided in White at an unspecified time that Daniel Keller had "abusive habits toward children." They further allege that on one occasion in August 1991, while visiting the Kellers, defendants Perry, White, and Quintero all saw Daniel Keller bring a number of children out of the day care center into the Kellers' adjoining home and sexually **\*303** abuse them. The record does not indicate whether B.N. and K.N. were among these children. According to plaintiffs, Perry, White, and Quintero did not attempt to stop Daniel Keller from abusing the children or report his crimes to the police or child welfare authorities.

Plaintiffs' brief filed in this Court alleges additional facts that were not contained in their trial court pleadings. They now assert that Perry pleaded guilty to indecency with a child by contact and that White and Quintero were indicted but not prosecuted for sex offenses involving the children at the day care center. Plaintiffs' trial court petition, however, did not allege that Perry, White, or Quintero participated in abusing

Exhibit D, Page 24

B.N. and K.N. or other children. We may not consider factual assertions that appear solely in the appellate briefs and not before the trial court. *See Estate of Arrington v. Fields,* 578 S.W.2d 173, 183 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.).

Instead, Mr. and Mrs. N. alleged only that Perry, White, and Quintero were negligent per se because they violated a statute requiring any person who "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse" to file a report with the police or the Department of Protective and Regulatory Services. TEX. FAM. CODE § 261.109(a). Plaintiffs also asserted gross negligence and common law negligence claims. They claimed that Perry, White, and Quintero's failure to report the abuse proximately caused them harm by permitting the day care center to remain open, thus enabling Daniel Keller to continue abusing the children at the center. They sought damages for pain, mental anguish, and medical expenses, as well as loss of income when they could not work outside the home because of B.N. and K.N.'s injuries.

Perry, White, and Quintero moved for summary judgment on the sole ground that plaintiffs failed to state a cause of action. None of the parties presented any summary judgment evidence. A court may not grant summary judgment for failure to state a cause of action without first giving the plaintiff an opportunity to amend the pleadings. *See Pietila v. Crites,* 851 S.W.2d 185, 186 n. 2 (Tex.1993). Before any defendant moved for summary judgment, however, White filed special exceptions arguing that plaintiffs had not stated a cause of action, and plaintiffs subsequently amended their petition. Although it appears from the record that Perry and Quintero did not file special exceptions, their motions for summary judgment were based solely on the grounds argued in White's special exceptions. Thus, Mr. and Mrs. N. had a fair opportunity to correct any deficiency in their pleadings.

The trial court granted Perry, White, and Quintero's motions for summary judgment and severed plaintiffs' claims against those three defendants from their suit against the Kellers, which is not before us. Because defendants' motions for summary judgment argued only that plaintiffs failed to state a cognizable claim, the trial court's judgment can be upheld, if at all, only on that ground. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). When the ground for the trial court's decision is that plaintiffs failed to state a cause of action, we must take the allegations in the pleadings as true in determining whether a cause of action exists. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 309 (Tex.1987).

The court of appeals affirmed the summary judgment on plaintiffs' common law negligence claims but reversed and remanded for trial on the issues of negligence per se and gross negligence, holding that a violation of the Family Code's child abuse reporting requirement is negligence per se. 944 S.W.2d 728. Mr. and Mrs. N. have not appealed the court of appeals' judgment affirming the summary judgment against them on common law negligence. Therefore, the question of whether Texas should impose a new common law duty to report child abuse on the facts of this case is not before us. *See generally Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 291–92 (Tex.1996); *Butcher v. Scott,* 906 S.W.2d 14, 15–16 (Tex.1995) (both refusing to recognize a common law duty to report abuse under the circumstances of those cases); *Greater Houston* **\*304** *Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (setting out factors for deciding whether a common law duty should exist). We granted defendants' application for writ of error to resolve the conflict between the court of appeals' decision remanding the negligence per se claims for trial and the decisions of three other courts of appeals declining to permit tort liability for violation of the statutory child abuse reporting requirement. *See Marshall v. First Baptist Church,* 949 S.W.2d 504, 508 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Childers v. A.S.,* 909 S.W.2d 282, 289–90 (Tex.App.—Fort Worth 1995, no writ); *Scott v. Butcher,* 906 S.W.2d 16, 20–21 (Tex.App.—Tyler 1994), *rev'd on other grounds,* 906 S.W.2d 14 (Tex.1995). [1]

"It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability." *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993). The court of appeals found a duty in the following mandatory child abuse reporting provisions of the Texas Family Code:

> A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter.

TEX. FAM.CODE § 261.101(a). [2]

(a) A person commits an offense if the person has cause to believe that a child's physical or mental health or welfare

Exhibit D, Page 25

has been or may be adversely affected by abuse or neglect and knowingly fails to report as provided in this chapter.

(b) An offense under this section is a Class B misdemeanor.

*Id.* § 261.109.[3]  The court concluded that these provisions create a "statutory duty" to report child abuse, and that a violation of this duty is negligence per se. *See* 944 S.W.2d at 730.

All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort. *See, e.g., Smith v. Merritt,* 940 S.W.2d 602, 607–08 (Tex.1997) (statute making it a crime to furnish alcohol to persons under age 21 did not impose a tort duty on social hosts). "It is well-established that the mere fact that the Legislature adopts a criminal statute does not mean that this court must accept it as a standard for civil liability." *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d 274, 278 (Tex.1979). "The considerations which warrant imposing tort liability are not identical with those which warrant criminal conviction," Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 COLUM. L.REV.. 21, 22–23 (1949), and we will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability.[4]  *See*   **\*305** *Smith,* 940 S.W.2d at 607; *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201, 204–05 (1959); *Phoenix Refining Co. v. Powell,* 251 S.W.2d 892, 896 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.).

Before we begin our analysis of whether section 261.109 of the Family Code is an appropriate basis for tort liability, we emphasize that we must look beyond the facts of this particular case to consider the full reach of the statute. We do not decide today whether a statute criminalizing only the type of egregious behavior with which these defendants are charged—the failure of eyewitnesses to report the sexual molestation of preschool children—would be an appropriate basis for a tort action. That is not the statute the Legislature passed. Rather, the issue before us is whether it is appropriate to impose tort liability on any and every person who "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report." TEX. FAM.CODE § 261.109(a). *Cf.* Leonard, *The Application of Criminal Legislation to Negligence Cases: A Reexamination,* 23 SANTA CLARA L.REV. 427, 457–66 (1983) (contrasting

the rigidity of statutory standards with the flexibility of case-by-case common law determinations of duty and breach).

The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *See Moughon v. Wolf,* 576 S.W.2d 603, 604 (Tex.1978); *East Tex. Motor Freight Lines v. Loftis,* 148 Tex. 242, 223 S.W.2d 613, 615 (1949); *Missouri, K & T. Ry. v. Saunders,* 101 Tex. 255, 106 S.W. 321, 321–23 (1908); RESTATEMENT (SECOND) OF TORTS §§ 286, 288. Texas's first mandatory child abuse reporting statute, from which Family Code section 261.101(a) is derived, stated that "[t]he purpose of this Act is to protect children who [ ] ... are adversely affected by abuse or neglect." Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790. Similarly, the current Family Code provision governing the investigation of reports of child abuse states that "[t]he primary purpose of the investigation shall be the protection of the child." TEX. FAM.CODE § 261.301(d).

B.N. and K.N. are within the class of persons whom the child abuse reporting statute was meant to protect, and they suffered the kind of injury that the Legislature intended the statute to prevent.[5]  But this does not end our inquiry. *See Praesel v. Johnson,* 967 S.W.2d 391, 395 (Tex.1998). The Court must still determine whether it is appropriate to impose tort liability for violations of the statute. *See Smith,* 940 S.W.2d at 607–08. This determination is informed by a number of factors, some discussed by the court of appeals in this case and others derived from past negligence per se decisions of Texas courts and from scholarly analyses.  **\*306**  These factors are not necessarily exclusive, nor is the issue properly resolved by merely counting how many factors lean each way. Rather, we set out these considerations as guides to assist a court in answering the ultimate question of whether imposing tort liability for violations of a criminal statute is fair, workable, and wise.

We first consider the fact that, absent a change in the common law, a negligence per se cause of action against these defendants would derive the element of duty solely from the Family Code. At common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress. *See Butcher,* 906 S.W.2d at 15; *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983). Although there are exceptions to this no-duty rule, *see, e.g., Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997) (noting that under some circumstances,

person in control of premises has duty to protect invitees from crime), this case does not fall within any of the established exceptions, and Mr. and Mrs. N. have not asked this Court to impose on persons who are aware of child abuse a new common law duty to report it or take other protective action.

In contrast, the defendant in most negligence per se cases already owes the plaintiff a pre-existing common law duty to act as a reasonably prudent person, so that the statute's role is merely to define more precisely what conduct breaches that duty. *See Rudes,* 324 S.W.2d at 204 ("We adopt the statutory test rather than that of the ordinarily prudent man as the more accurate one to determine negligence ...."); *see also Moughon,* 576 S.W.2d at 604; RESTATEMENT (SECOND) OF TORTS § 286 (1965) (both defining negligence per se as the judicial adoption of a statute to define the standard of conduct of a reasonable person). For example, the overwhelming majority of this Court's negligence per se cases have involved violations of traffic statutes by drivers and train operators —actors who already owed a common law duty to exercise reasonable care toward others on the road or track. *See, e.g., Murray v. O & A Express, Inc.,* 630 S.W.2d 633 (Tex.1982); *Impson v. Structural Metals, Inc.,* 487 S.W.2d 694 (Tex.1972); *Missouri–Kansas–Texas R.R. Co. v. McFerrin,* 156 Tex. 69, 291 S.W.2d 931 (1956); *Liberty Film Lines v. Porter,* 136 Tex. 49, 146 S.W.2d 982 (1941); *Texas Co. v. Betterton,* 126 Tex. 359, 88 S.W.2d 1039 (1936); *Lancaster & Wight v. Allen,* 110 Tex. 213, 217 S.W. 1032 (1920); *Missouri, K & T Ry. Co. v. Saunders,* 101 Tex. 255, 106 S.W. 321 (1908); *San Antonio & A.P. Ry. Co. v. Bowles,* 88 Tex. 634, 32 S.W. 880 (1895).

When a statute criminalizes conduct that is also governed by a common law duty, as in the case of a traffic regulation, applying negligence per se causes no great change in the law because violating the statutory standard of conduct would usually also be negligence under a common law reasonableness standard. *See Praesel,* 967 S.W.2d at 395; *Parrott v. Garcia,* 436 S.W.2d 897, 900 (Tex.1969); *Rudes,* 324 S.W.2d at 204; Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 COLUM. L.REV.. 21, 34 (1949). But recognizing a new, purely statutory duty "can have an extreme effect upon the common law of negligence" when it allows a cause of action where the common law would not. *See* Leonard, 23 SANTA CLARA L.REV. at 449 n. 92. In such a situation, applying negligence per se "bring[s] into existence a new type of tort liability." *Burnette v. Wahl,* 284 Or. 705, 588 P.2d 1105, 1109 (1978). The change tends to be especially great when, as here, the statute criminalizes inaction rather than action. *See generally Otis Eng'g,* 668 S.W.2d at 309;

3 HARPER ET AL., THE LAW OF TORTS § 18.6 (2d ed.1986); KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 56, at 373–77 (5th ed.1984); Thayer, *Public Wrong and Private Action,* 27 HARV. L.REV.. 317 (1914) (all discussing traditional tort law distinction between misfeasance and nonfeasance).

Some commentators contend that the term "negligence per se" does not even apply when the statute on which civil liability is based corresponds to no common law duty. *See* KEETON ET AL. § 36, at 221 n. 9; Forell, *The Statutory Duty Action in Tort: A Statutory/Common Law Hybrid,* 23 IND. L.REV. 781, 782 (1990). While our definition has never been so restrictive, this Court in fact **\*307** has created a new duty by applying negligence per se on only one occasion. In *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985), a third party dragged the plaintiff into an unlocked vacant apartment owned by the defendant and raped her. Because the plaintiff was a trespasser according to traditional premises liability categories, the defendant landowner owed her no common law duty. *See id.* at 548. Although two members of this Court would have recognized a new common law duty of reasonable care toward trespassers, at least in certain cases, *see id.* at 551–54 (Kilgarlin, J., concurring); *id.* at 554 (Spears, J., concurring), a plurality instead found a duty only in a city ordinance requiring landowners to keep vacant buildings locked. *See id.* at 549. But in our next major negligence per se case, *El Chico Corp. v. Poole,* we returned to the norm of deriving duty from the common law and looking to the statute only for the standard of conduct. Only after we created a new common law duty not to sell alcohol to intoxicated persons, *see El Chico,* 732 S.W.2d at 309–12, did we adopt a relevant section of the Alcoholic Beverage Code as "the attendant standard of conduct." *Id.* at 312–13. Thus, based on both this Court's past practice and the observations of noted scholars, we conclude that the absence of a relevant common law duty should be considered in deciding whether to apply negligence per se to the Family Code's reporting provision.

The court of appeals in this case listed several factors to consider in deciding whether to apply negligence per se. *See* 944 S.W.2d at 730 (citing Ratliff, Comment, *Negligence Per Se in Texas,* 41 TEX. L.REV. 104, 106 (1962)). According to the court of appeals, the principal factors favoring negligence per se are that the Legislature has determined that compliance with criminal statutes is practicable and desirable and that criminal statutes give citizens notice of what conduct is required of them. *See id.* As considerations against negligence per se, the court of appeals cautioned that some penal statutes

may be too obscure to put the public on notice, may impose liability without fault, or may lead to ruinous monetary liability for relatively minor offenses. *See id.* The first of these factors is not helpful because it points the same way in every case: the very existence of a criminal statute implies a legislative judgment that its requirements are practicable and desirable. The court of appeals' remaining factors, however, are pertinent to our analysis.

On the question of notice, this Court has held that one consideration bearing on whether to apply negligence per se is whether the statute clearly defines the prohibited or required conduct. *See Praesel,* 967 S.W.2d at 395; *Carter,* 584 S.W.2d at 278; RESTATEMENT (SECOND) OF TORTS § 874A cm t. h(1). The Family Code's reporting requirement is triggered when a person "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect." TEX. FAM.CODE § 261.109(a). In this case, defendants allegedly were eyewitnesses to sexual abuse. Under these facts, there is no question that they had cause to believe abuse was occurring, and thus that the statute required them to make a report. In many other cases, however, a person may become aware of a possible case of child abuse only through second-hand reports or ambiguous physical symptoms, and it is unclear whether these circumstances are "cause to believe" that such conduct "may be" taking place.[6] *See Scott,* 906 S.W.2d at 20. A statute that conditions the requirement to report on these difficult judgment calls does not clearly define **\*308** what conduct is required in many conceivable situations.[7]

The next factor the court of appeals considered was whether applying negligence per se to the reporting statute would create liability without fault. *See* 944 S.W.2d at 730. We agree with the court of appeals that it would not, because the statute criminalizes only the "knowing[ ]" failure to report.[8] *See id.; see also El Chico,* 732 S.W.2d at 313 (holding under a similarly worded statute that "a liquor licensee is negligent as a matter of law under the statute when he *knowingly* sells an alcoholic beverage to an intoxicated person" (emphasis added)). This characteristic of the statute weighs in favor of imposing civil liability.

Our next consideration is whether negligence per se would impose ruinous liability disproportionate to the seriousness of the defendant's conduct. In analyzing this factor, the court of appeals treated child abuse as the relevant conduct. *See* 944 S.W.2d at 730 ("[T]he abuse of children has become

notorious."). The conduct criminalized by section 261.109, however, is not child abuse but the failure to report child abuse. Through its penal laws, the Legislature has expressed a judgment that abuse and nonreporting deserve very different legal consequences. The abuser in this case committed the offense of aggravated sexual assault on a child under the age of fourteen, a first degree felony carrying a penalty of five to ninety-nine years in prison and a fine of up to $10,000. *See* TEX. PEN.CODE §§ 22.021, 12.32. Almost all of the other acts of abuse and neglect covered by the reporting requirement, *see* TEX. FAM.CODE § 261.001(1), (4) (defining "abuse" and "neglect"), are also felonies. *See* TEX. PEN.CODE § 22.04 (injury to a child); *id.* § 22.041 (abandoning or endangering child); *id.* § 22.011(a)(2), (f) (statutory rape). Even the lowest level of felony is punishable by 180 days to two years in jail and a $10,000 fine, *see id.* § 12.35, and automatically deprives the offender of certain civil rights such as the franchise, *see* TEX. ELEC.CODE § 13.001(a)(4), eligibility for public office, *see id.* § 141.001(a) (4), and the right to own a firearm, *see* TEX. PEN.CODE § 46.04(a). By contrast, failure to report abuse or neglect, no matter how serious the underlying crime, is a class B misdemeanor punishable by no more than six months in jail and a $2,000 fine. *See* TEX. FAM.CODE § 261.109(b); TEX. PEN.CODE § 12.22. This evidence of legislative intent to penalize nonreporters far less severely than abusers weighs against holding a person who fails to report suspected abuse civilly liable for the enormous damages that the abuser subsequently inflicts. The specter of disproportionate liability is particularly troubling when, as in the case of the reporting statute, it is combined with the likelihood of "broad and wide-ranging liability" by collateral wrongdoers that we condemned in *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d at 279.

Finally, in addition to the factors discussed by the court of appeals, we have also looked to whether the injury resulted directly or indirectly from the violation of the statute. *See Praesel,* 967 S.W.2d at 395. In *Carter v. William Sommerville & Son, Inc.,* we refused to apply negligence per se liability to a provision of the Texas Motor Carrier Act making it a misdemeanor to aid and abet any violation of the Act. *See Carter,* 584 S.W.2d at 278–79. We concluded that the aiding and abetting section was "too far removed to be adopted as a standard" for civil liability, in part because "[i]t is only by first finding a violation of some other section of the Act that the court may then find a violation" of that **\*309** provision. *Carter,* 584 S.W.2d at 279. Like the aiding and abetting provision in *Carter,* Family Code section 261.109 defines the

Exhibit D, Page 28

misdemeanor of failure to report child abuse in terms of the wrongful act of a third party. Under *Carter* 's reasoning, the indirect relationship between violation of such a statute and the plaintiff's ultimate injury is a factor against imposing tort liability.

The lack of direct causation is not in itself dispositive; we have imposed civil liability for some statutory violations that caused the plaintiff's injury by facilitating the tort of a third party. *See El Chico,* 732 S.W.2d at 312–13 (statute prohibiting sale of alcohol to intoxicated person); *Nixon,* 690 S.W.2d at 548–49 (building ordinance requiring security measures). But a reporting statute by definition places a *fourth* party between the defendant and the plaintiff: the person or agency to whom the defendant is required to make the report. Thus, the connection between the defendant's conduct and the plaintiff's injury is significantly more attenuated in a case based on failure to report than in *Nixon* or *El Chico.* We are not aware of any Texas case applying negligence per se to a statute that, like the child abuse reporting provision, interposes not one but two independent actors between the plaintiff and the defendant.

We conclude by noting that for a variety of reasons, including many of those we have discussed, most other states with mandatory reporting statutes similar to Texas's have concluded that the failure to report child abuse is not negligence per se. *See C.B. v. Bobo,* 659 So.2d 98, 102 (Ala.1995); *Fischer v. Metcalf,* 543 So.2d 785, 790–91 (Fla.Dist.Ct.App.1989); *Cechman v. Travis,* 202 Ga.App. 255, 414 S.E.2d 282, 284 (1991); *Borne v. Northwest Allen County Sch. Corp.,* 532 N.E.2d 1196, 1202–03 (Ind.Ct.App.1989); *Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.,* 249 Kan. 348, 819 P.2d 587, 604 (1991); *Valtakis v. Putnam,* 504 N.W.2d 264, 266 (Minn.Ct.App.1993); *Bradley v. Ray,* 904 S.W.2d 302, 312–14 (Mo.Ct.App.1995); *Marquay v. Eno,* 139 N.H. 708, 662 A.2d 272, 276–78 (1995). *But see Landeros v. Flood,* 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389, 396–97 (1976);

*Curran v. Walsh Jesuit High Sch.,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030 (1995); *Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899, 909 (Tenn.Ct.App.1992).

In summary, we have considered the following factors regarding the application of negligence per se to the Family Code's child abuse reporting provision: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute. Because a decision to impose negligence per se could not be limited to cases charging serious misconduct like the one at bar, but rather would impose immense potential liability under an ill-defined standard on a broad class of individuals whose relationship to the abuse was extremely indirect, we hold that it is not appropriate to adopt Family Code section 261.109(a) as establishing a duty and standard of conduct in tort. Therefore, Mr. and Mrs. N. and their children may not maintain a claim for negligence per se or gross negligence based on defendants' violation of the child abuse reporting statute. Because plaintiffs did not appeal the court of appeals' adverse decision on their common law negligence claims, we do not consider whether Texas should impose a common law duty to report or prevent child abuse.

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.

**All Citations**

973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162

## Footnotes

1    This Court was unable to address the negligence per se issue in *Butcher* for jurisdictional reasons. *See Butcher v. Scott,* 906 S.W.2d 14, 16 (Tex.1995). This case thus presents our first opportunity to consider this question.

2    This mandatory reporting statute was enacted in 1971. *See* Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790, 2791. Prior to that time, Texas did not require the reporting of child abuse, although there were statutes granting immunity from suit to doctors and other professionals who chose to report cases of suspected abuse. *See* Act of April 26, 1965, 59th Leg., R.S., ch. 117, 1965 Tex. Gen. Laws 277 (physicians); Act of May 5, 1969, 61st Leg., R.S., ch. 219, 1969 Tex. Gen. Laws 637 (other professionals).

The version of this provision in force at the time of the events in this case read "has been *or may be* adversely affected." *See* 944 S.W.2d at 729 (quoting former TEX. FAM.CODE § 34.01(a)) (emphasis added). The Legislature deleted the italicized language in 1997. *See* Act of Sept. 1, 1997, 75th Leg., R.S., ch. 1022, § 65, 1997 Tex. Gen. Laws 3733, 3760. However, the phrase "or may be" remains in the current version of § 261.109(a).

3    This provision criminalizing the failure to report was added in 1973. *See* Act of May 17, 1973, 63d Leg., R.S., ch. 398, § 1, 1973 Tex. Gen. Laws 881.

4    At times, our opinions have included language suggesting that any statutory violation is automatically negligence per se. *See, e.g., Southern Pac. Co. v. Castro,* 493 S.W.2d 491, 497 (Tex.1973) (stating that to prove negligence per se, one must prove the unexcused violation of a penal standard). Yet these same opinions recognize the Restatement of Torts as the law of Texas on negligence per se, and the Restatement expressly states that the adoption of criminal statutes into tort law is a matter of judicial discretion: "The correct rule is ...: 'The unexcused violation of a legislative enactment or an administrative regulation *which is adopted by the court as defining the standard of conduct of the reasonable man,* is negligence in itself.' " *Southern Pac.,* 493 S.W.2d at 497 (emphasis added)(quoting RESTATEMENT (SECOND) OF TORTS § 288B (1965)); *see also* RESTATEMENT (SECOND) OF TORTS § 286 (1965) ("The court *may* adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment ....") (emphasis added); *id.* cmt. d ("Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.").

5    A few courts in other jurisdictions have interpreted mandatory reporting statutes as intended to protect only the specific child the defendant suspects is being abused, not other potential victims of the same abuser. *See Curran v. Walsh Jesuit High School,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030–31 (1995); *Marcelletti v. Bathani,* 198 Mich.App. 655, 500 N.W.2d 124, 127 (1993). It is unclear from the pleadings whether B.N. and K.N. were among the children whom defendants saw being abused. But whether or not *Curran* and *Marcelletti* 's analysis applies to the Texas reporting statute, B.N. and K.N. are within the protected class on the facts of this case. According to the pleadings, defendants saw Daniel Keller take some of the children enrolled in the day care center out of the center into an adjoining room of the Kellers' home and sexually abuse them. This gave defendants "cause to believe" that the "physical or mental health or welfare" of all the children attending the day care center—not only the particular children they saw beingabused on that occasion—"may be adversely affected by abuse or neglect." *See* TEX. FAM.CODE § 261.109(a). Thus, the statute required defendants to make a report concerning all the children at the center.

6    Determining whether abuse is or may be occurring in a particular case is likely to be especially difficult for untrained laypersons. Texas is one of a minority of states that require any person who suspects child abuse to report it. *See* O'Brien & Flannery, *The Pending Gauntlet to Free Exercise: Mandating that Clergy Report Child Abuse,* 25 LOY. L.A. L.REV. . 1, 24–25 & n. 127 (1991) (collecting statutes). Most states place such a requirement only on professionals who may be expected to know more than the average person about recognizing child abuse and who have a professional relationship with and responsibility for children. *See id.* at 19 n. 106 (collecting statutes); *id.* at 24. The Texas Family Code contains a separate mandatory reporting provision, not relevant here, specifically directed to members of certain professions. *See* TEX. FAM.CODE § 261.101(b).

Exhibit D, Page 30

7       We do not mean to suggest that section 261.109 is unconstitutionally vague. In fact, one court of appeals has already rejected an as-applied vagueness challenge to this provision. *See Morris v. State,* 833 S.W.2d 624, 627 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). A statute's lack of clarity need not rise to a constitutionally suspect level in order to be a factor in our determination of whether imposing negligence per se is appropriate.

8       Although the issue of strict liability is related to the problem of notice, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), a statute may require scienter and yet fail to define clearly the prohibited conduct. *Cf. Long v. State,* 931 S.W.2d 285, 289 (Tex.Crim.App.1996).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit D - Page 31

# Exhibit B

NO. _____

| | | |
|---|---|---|
| **WILLIAM SNYDER AND** | § | |
| **SHIRLEY SNYDER,** | § | |
| *Claimants,* | § | |
| | § | **BEFORE THE** |
| **v.** | § | |
| | § | **AMERICAN** |
| **WELLS FARGO BANK,** | § | **ARBITRATION** |
| **N.A.,** | § | **ASSOCIATION** |
| *Respondent.* | § | |

## <u>WILLIAM SNYDER AND SHIRLEY SNYDER'S STATEMENT OF CLAIM</u>

Claimants William Snyder and Shirley Snyder (collectively "Claimants" or "Snyders") file this their Statement of Claim before the American Arbitration Association against Respondent Wells Fargo Bank, N.A. ("Wells Fargo") and would respectfully show the following:

### I.    FACTS

**A.    Claimants are vulnerable adults who were financially exploited.**

1.    Claimants were at all relevant times over sixty-five years of age. On or about August 28, 2020, Claimant William Snyder received a popup notice that his computer was vulnerable

*Claimants' Statement of Claim*                    *Page 1 of 8*

to scams and viruses. The popup was sent by "Microsoft NC LLC" (not a real Microsoft company).

2.     The phony company charged Claimant William Snyder $100 for a lifetime membership to protect his computer forever. Claimant William Snyder was instructed to download an app that would allow the phony company access to Claimant William Snyder's computer.

3.     On or about November 17, 2020, Claimant William Snyder received an email from "NTS IT CARE" saying he needed to make a phone call regarding his computer protection. Claimant William Snyder called the number and talked with "Mike Thomas," who identified himself as a Microsoft employee.

4.     After that initial call, "Mike Thomas" would call Claimant William Snyder with directions to go to Wells Fargo in person and withdraw cash. Thomas told William Snyder to wrap the money in aluminum foil, bubble wrap, shipping paper, and box it. If the requested amount was $80,000.00, then Thomas would direct Claimant William Snyder to separate the money into two packages.

*Claimants' Statement of Claim*                    *Page 2 of 8*

5.     Claimant William Snyder asked Thomas why Thomas needed the cash. Thomas replied that Thomas would put the cash into Claimant William Snyder's stocks and bonds.

6.     Thomas, of course, never put the cash into Claimant William Snyder's brokerage accounts.

**B.     Respondent had duties to protect the Snyders.**

7.     Thomas' plan could not have succeeded without Respondent's violation of statutes protecting vulnerable adults. Claimants were at all relevant times customers of Wells Fargo.

8.     For many years, Claimants conducted business with Respondent and, over the course of those many years, were encouraged to trust and follow Respondent's financial advice. Over decades-long relationships, Claimants never made any frequent or unusual withdrawals or transfers.

9.     On November 12, 2020, Wells Fargo cashiers in Midland, Texas approved a withdrawal of $20,000.00 in cash. Between November 12, 2020 and May 26, 2021 (a period of just six months), Wells Fargo Tellers approved sixty cash withdrawals

totaling $3,999,000.00. See Ex. A, attached and incorporated by reference.

10.  Claimants had never made the kinds of cash withdrawals and transfers described above in the decades during which they did business with Respondent.

## II.    CAUSES OF ACTION

### A.    Negligence Per Se

11.  As described above, Thomas established an ongoing relationship with Claimant William Snyder before asking Claimant William Snyder to send cash. Thomas used Claimants' resources for monetary or personal benefit without Claimants' informed consent.

12.  Wells Fargo employees (including but not limited to the cashiers who approved sixty cash withdrawals in a six-month period) had cause to believe that William, their account holder, was being subjected to financial exploitation. "Cause to believe" arose from the execution of sixty cash transactions totaling millions of dollars unlike any other transactions Claimants had posted to their accounts over a decades-long relationship.

*Claimants' Statement of Claim*               *Page 4 of 8*

13.  The Wells Fargo cashiers had duties to notify Wells Fargo of the suspected financial exploitation. TEX. FIN. CODE § 281.002(a). On information and belief, the cashiers breached this duty.

14.  Even if cashiers did not fulfill their duties to report, Wells Fargo had an independent duty to assess the suspected financial exploitation and submit a report to the Texas Department of Family and Protective Services. TEX. FIN. CODE § 281.002(b).

15.  Wells Fargo also had a duty to adopt internal policies, programs, plans, and procedures to report and assess suspected financial exploitation of vulnerable adults. TEX. FIN. CODE § 281.002(d). Wells Fargo breached this duty and Claimants suffered damages as a proximate result.

16.  Wells Fargo and its cashiers violated the cited statutes and breached their legal duties to Claimants as described above, and Claimants suffered massive losses as a proximate result of the breaches. Because of these violations, Wells Fargo and its tellers are liable to Claimants for negligence per se. Claimants are in the class of persons the cited statutes are intended to protect.

*Claimants' Statement of Claim*                    *Page 5 of 8*

**B.    Breach of Fiduciary Duty**

17.    Respondent Wells Fargo owed Claimants fiduciary duties. Wells Fargo breached their duties by not reporting suspicious activity, by not having procedures in place to detect financial exploitation of vulnerable results, and by not placing holds on the account once suspicious activity appeared.

18.    Respondent Wells Fargo's breaches of fiduciary duty caused Claimants to suffer massive financial losses. In addition, all monies paid from Claimants to Respondent should be disgorged.

**C.    Vicarious Liability**

19.    Wells Fargo is vicariously liable for the acts of its tellers under the doctrine of respondeat superior.

20.    Every allegation of organizational wrongdoing was committed by the wrongdoer's agents or employees, and the organizational Respondent is liable to Claimants under the doctrine of respondeat superior.

**D.    Gross Negligence**

21.    Respondent's wrongful actions were grossly negligent, and Claimants seek exemplary damages.

*Claimants' Statement of Claim*                    *Page 6 of 8*

## III.   DAMAGES

22.   Claimants are entitled to actual damages in excess of $1,000,000.00

23.   Additionally, Claimants are entitled to exemplary damages because Claimants' injuries resulted from Respondent's malice or gross negligence.

## IV.   PRAYER

24.   Claimants William Snyder and Shirley Snyder respectfully request that they take judgment against Respondent and recover:

a.   All the actual damages and exemplary damages caused by the wrongful conduct complained of herein;

b.   Pre- and post-judgment interest;

c.   Costs of arbitration; and

d.   Other such relief at law and equity for which he may be justly entitled.

*Claimants' Statement of Claim*                    *Page 7 of 8*

Respectfully submitted,

**BUTCH BOYD LAW FIRM**

_____

ERNEST W. "BUTCH" BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
MICHAEL J. BLANCHARD
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.c
om
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563
**ATTORNEYS FOR CLAIMANTS
WILLIAM     SNYDER     AND
SHIRLEY SNYDER**


And –

**THE GALLAGHER LAW FIRM
PLLC**

_/s/ Michael T. Gallagher_
MICHAEL T. GALLAGHER
State Bar No. 07586000
mike@gld-law.com
2905 Sackett Street
Houston, TX 77098-1127
Tel. No. (713) 222-8080
Fax. (713) 222-0066
**ATTORNEYS FOR CLAIMANTS
WILLIAM     SNYDER     AND
SHIRLEY SNYDER**

_Claimants' Statement of Claim_          _Page 8 of 8_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record on 8th day of July, 2022 as follows:

*<u>Via Email</u>*
Robert T. Mowrey
Arthur E. Anthony
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000
(214) 740-8800 (Facsimile)
rmowrey@lockelord.com
aanthony@lockelord.com

B. David L. Foster
Daniel Durell
LOCKE LORD LLP
600 Congress Ave., Suite 2200
Austin, Texas 78701
(512) 305-4700
(512) 305-4800 (Facsimile)
dfoster@lockelord.com
daniel.durell@lockelord.com
ATTORNEYS FOR RESPONDENT,
WELLS FARGO BANK, N.A.

_____
MICHAEL J. BLANCHARD

*Claimants' Statement of Claim*          *Page 9 of 8*

# Teller Withdrawals

| Transaction Date | From | To | Amount |
|---:|---|---|---:|
| 11/12/2020 | Wells Fargo Checking | Teller Withdrawal | $20,000.00 |
| 11/19/2020 | Wells Fargo Checking | Teller Withdrawal | $30,000.00 |
| 11/20/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 11/23/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 11/24/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 11/25/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 11/27/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 11/30/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 12/1/2020 | Wells Fargo Checking | Teller Withdrawal | $35,000.00 |
| 12/2/2020 | Wells Fargo Checking | Teller Withdrawal | $40,000.00 |
| 12/4/2020 | Wells Fargo Checking | Teller Withdrawal | $40,000.00 |
| 12/7/2020 | Wells Fargo Checking | Teller Withdrawal | $40,000.00 |
| 12/9/2020 | Wells Fargo Checking | Teller Withdrawal | $48,000.00 |
| 12/11/2020 | Wells Fargo Checking | Teller Withdrawal | $51,000.00 |
| 12/17/2020 | Wells Fargo Checking | Teller Withdrawal | $70,000.00 |
| 12/18/2020 | Wells Fargo Checking | Teller Withdrawal | $55,000.00 |
| 1/4/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/5/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/7/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/8/2021 | Wells Fargo Checking | Teller Withdrawal | $40,000.00 |
| 1/20/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/21/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/25/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/26/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 1/27/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 2/2/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 2/4/2021 | Wells Fargo Checking | Teller Withdrawal | $70,000.00 |
| 2/4/2021 | Wells Fargo Checking | Teller Withdrawal | $10,000.00 |
| 2/8/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 2/9/2021 | Wells Fargo Checking | Teller Withdrawal | $50,000.00 |
| 2/17/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 2/18/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/1/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/3/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |

| Transaction Date | From | To | Amount |
|---|---|---|---|
| 3/4/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/9/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/11/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/15/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/16/2021 | Wells Fargo Checking | Teller Withdrawal | $60,000.00 |
| 3/22/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/23/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/24/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/25/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/29/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/30/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 3/31/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/1/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/8/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/12/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/13/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/14/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/15/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/16/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/22/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 4/27/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 5/6/2021 | Wells Fargo Checking | Teller Withdrawal | $90,000.00 |
| 5/19/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 5/20/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 5/24/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| 5/26/2021 | Wells Fargo Checking | Teller Withdrawal | $80,000.00 |
| | 60 | | **$3,999,000.00** |

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| WILLIAM SNYDER AND SHIRLEY SNYDER, | ) ) | Case No. 01-22-0002-8877 |
| Claimants, | ) | |
| | ) | **CLAIMANTS' OBJECTIONS AND** |
| vs. | ) | **RESPONSES TO INTERROGATORIES** |
| | ) | |
| WELLS FARGO BANK, N.A., | ) | |
| Respondent. | ) | |
| | ) | |

TO:     Respondent Wells Fargo Bank, N.A. ("Wells Fargo"), by and through its attorneys of record, B. David L. Foster, and Daniel Durell of Locke Lord, LLP, 600 Congress Avenue, Ste. 2200, Austin, TX 78701 and Robert T. Mowrey of Locke Lord, LLP, 2200 Ross Ave., Ste. 2800, Dallas, TX 75201.

Claimants William Snyder ("William") and Shirley Snyder (hereinafter collectively referred to as "Claimants" and/or "the Snyders") serve these foregoing Objections and Responses to Respondent Wells Fargo Bank, N.A.'s Interrogatories pursuant to Texas Rules of Civil Procedure and AAA Arbitration Rules based on the facts and information currently known and available to Claimants. Claimants reserve the right to amend and/or supplement these responses as additional information becomes available or is discovered and in accordance with AAA Arbitration Rules that govern this case and in accordance with Texas Rules of Civil Procedure, where applicable.

Dated: January 20, 2023.

Respectfully submitted,

*/s/ Ernest W. "Butch" Boyd*

ERNEST W. "BUTCH" BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
MICHAEL J. BLANCHARD
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
JILLIAN SCHERRER
State Bar No. 24117793
jillianscherrer@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563

- AND
Michael T. Gallagher
The Gallagher Law Firm PLLC
2905 Sackett Street
Houston, Texas 77098-1127
mike@gld-law.com
**ATTORNEYS FOR CLAIMANTS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on January 20, 2023, via email upon the following:

**VIA EMAIL**
B. David L. Foster
Texas Bar No. 24031555
dfoster@lockelord.com
Daniel Durell
Texas Bar No. 24078450
daniel.durell@lockelord.com
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: (512) 305-4700
Facsimile: (512) 305-4800

**VIA EMAIL**
Robert T. Mowrey
Texas Bar No. 14607500
rmowrey@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

*/s/ Ernest W. "Butch" Boyd*
Ernest W. "Butch" Boyd

3. Identify the date, content, and method of each communication (telephone, email, mail, text message, social media messages, etc.) you had with the Fraudsters, including Mike Thomas and representatives from Microsoft NC LLC and NTS IT Care.

RESPONSE:

- The first communication was an email from "Microsoft" informing Mr. Snyder that his computer was "in danger" and that he needed to contact Microsoft via phone.
- Mr. Snyder then contacted "Microsoft" and communicated with Microsoft about fixing his computer problems. William eventually connected with a Microsoft technician named "Mike Thomas" that would help Mr. Snyder resolve his computer problems.
- From that point forward, all communications with the fraudsters were done via telephone.
  - These phone calls were with "Mike Thomas" and occurred between August 2020 and July 2021.
  - The phone calls occurred almost daily, including several calls during the same day.
- The phone calls included discussions about how the Snyders would lose all their financial assets unless the fraudsters' directives were followed. Mike Thomas explained that William's computer had been hacked and all their financial assets would be drained unless their money was removed from their accounts and sent to Microsoft for safe keeping and investment. In fact, Mike Thomas showed William false documentation from Microsoft that dozens of individuals were attempting to hack his bank accounts leading William to believe that his financial assets were not secure.
- Mike Thomas informed William that the only way to protect their financial assets would be to funnel them through an account with Microsoft for safe keeping. Then, once the computer problems were fixed, Microsoft would transfer the money back. Mike Thomas said that Microsoft would front $20,000 to start with and put that into William's Wells Fargo account. Mike Thomas provided falsified Wells Fargo bank account statements showing that Microsoft transferred $20,000 into William's account. Accordingly, William then withdrew $20,000 cash to comply with Mike Thomas' directives to keep his money safe.  This routine of showing William false bank account statements with money being transferred continued for approximately 6 months. Because William was only seeing these falsified bank statements, William did not realize that he was being scammed and losing money each time he made a cash withdrawal.
- From there, the fraudster directed William through every step of the scheme, including when to withdraw cash, how to pack & ship the cash, where to mail the cash, and gave directives not to disclose this information to anyone or let anyone touch his computer.

AMERICAN ARBITRATION
ASSOCIATION

| | | |
|---|---|---|
| WILLIAM SNYDER AND SHIRLEY SNYDER, | ) | Case No. 01-22-0002-8877 |
| Claimants, | ) | |
| | ) | **DECLARATION IN SUPPORT OF** |
| vs. | ) | **CLAIMANTS' OBJECTIONS AND** |
| | ) | **RESPONSES TO INTERROGATORIES** |
| WELLS FARGO BANK, N.A., | ) | |
| Respondent. | ) | |
| | ) | |

## DECLARATION OF CLAIMANTS IN SUPPORT OF OBJECTIONS AND RESPONSES TO RESPONDENT'S INTERRGATORIES

Pursuant    to    Texas    Civil    Practice    &    Remedies    Code    §132.001,    I, _WILLIAM O. SNYDER_, declare under penalty of perjury that the facts set forth in Claimants' Objections and Responses to Respondent Wells Fargo Bank, N.A.'s First Set of Interrogatories are based on personal knowledge and are true and correct.

My name is _WILLIAM O. SNYDER_, my date of birth is _01/20/1932_, and my address is _2901 GODFREY St. Midland, TX 79707_. I declare under penalty of perjury that the foregoing is true and correct.

_William O. Snyder_

Printed Name: _WILLIAM O. SNYDER_

Dated: _02/04/2023_

## AMERICAN ARBITRATION
## ASSOCIATION

| | |
|---|---|
| WILLIAM SNYDER AND SHIRLEY SNYDER,<br>Claimants,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 01-22-0002-8877<br><br>**DECLARATION IN SUPPORT OF CLAIMANTS' OBJECTIONS AND RESPONSES TO INTERROGATORIES** |

## DECLARATION OF CLAIMANTS IN SUPPORT OF OBJECTIONS AND RESPONSES TO RESPONDENT'S INTERRGATORIES

Pursuant to Texas Civil Practice & Remedies Code §132.001, I, _Shirley A. Snyder_, declare under penalty of perjury that the facts set forth in Claimants' Objections and Responses to Respondent Wells Fargo Bank, N.A.'s First Set of Interrogatories are based on personal knowledge and are true and correct.

My name is _Shirley A. Snyder_, my date of birth is _4/21/1932_, and my address is _2961 Godfrey St. Midland, Tx 79707_ I declare under penalty of perjury that the foregoing is true and correct.

_Shirley A. Snyder_

Printed Name: _Shirley A. Snyder_

Dated: _02/04/2023_